Connie ROSKA, on behalf of minor children Rusty and Jessica Roska, and Maria Stewart; James Roska, on behalf of minor children Rusty and Jessica Roska, and Maria Stewart; Rusty Roska, Plaintiffs–Appellants,

v.

Craig T. PETERSON; Melinda Sneddon; Shirley Morrison; Colleen Lasater; Dan Choate; Darla Rampton, Defendants–Appellees.

No. 01–4057.

United States Court of Appeals, Tenth Circuit.

Sept. 5, 2002.

Steven C. Russell, Affordable Legal Advocates, P.C., Salt Lake City, Utah, appearing for Appellants.

Nancy L. Kemp, Assistant Attorney General (Mark L. Shurtleff, Utah Attorney General, with her on the brief), Office of the Attorney General, Salt Lake City, Utah, appearing for the Appellees.

Before TACHA, Chief Judge, BALDOCK, and LUCERO, Circuit Judges.

TACHA, Chief Judge.

Plaintiffs brought this suit under 42 U.S.C. § 1983, alleging deprivations of various Fourth and Fourteenth Amendment rights. The district court found that defendants were entitled to qualified immunity and dismissed the suit. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and AFFIRM in part, REVERSE in part, and REMAND for further proceedings.

## I. Background

On May 20, 1999, Connie Roska ("Mrs.Roska") dropped off her 12–year–old son, Rusty Roska ("Rusty"), at school. He was wearing a parka even though it was 70 degrees outside. Patricia Maynor, a school nurse, noticed that Rusty looked ill, was sweating, and had a pallid complexion. Mrs. Roska apparently stated that Rusty was suffering from kidney failure. The school nurse called Rusty's rehabilitation physician, Dr. Judith Gooch, who allegedly informed the nurse that he did not have kidney failure.[1]

On May 26, 1999, employees for the Davis County School District met with Melinda Sneddon, a caseworker for Utah's Division of Child and Family Services (DCFS). The school district employees expressed concern for Rusty's health and provided several documents to DCFS. These documents included records that show that in April of 1998, Mrs. Roska told a teacher that Rusty had a hole in his esophagus. Further investigation indicated that Mrs. Roska had allegedly claimed that Rusty suffered from a disease that is only suffered by 10 or 100 people in the world.

Sneddon assigned Shirley Morrison, another caseworker, to investigate. Morrison suspected that Mrs. Roska suffered from Munchausen Syndrome by Proxy ("MSBP"), a disorder where an individual, usually a mother, inflicts physical harm upon his or her children in order to gain the sympathy and attention of medical personnel. E. Selene Steelman, Note, *A Question of Revenge: Munchausen Syndrome by Proxy and a Proposed Diminished Capacity Defense for Homicidal Mothers*, 8 Cardozo Women's L.J. 261, 262–63 (2002).[2] Morrison's investigation revealed that one of Rusty's psychologists and a doctor at Primary Children's Hospital had suspected MSBP but were unable to substantiate a diagnosis. Although Morrison later admitted that Rusty was not in imminent danger of death,[3] the decision was made to remove Rusty from the Roskas' home.[4]

---

1. Dr. Gooch denies having this conversation.

2. Munchausen Syndrome by Proxy was first diagnosed in 1977. It is a variation of Munchausen Syndrome, a disorder named after Karl Fredrich von Munchausen, a German nobleman with a penchant for telling lies about his adventures in life. Melissa A. Prentice, Note, *Prosecuting Mothers Who Maim and Kill: The Profile of Munchausen Syndrome by Proxy Litigation in the Late 1990s*, 28 Am. J.Crim. L. 373, 376 (2001); *see also The Adventures of Baron von Munchausen* (Columbia Pictures 1988). While patients with traditional Munchausen Syndrome induce or exaggerate their own illnesses in order to gain the attention of medical professions, MSBP patients cause such illness in others. *Id.* MSBP patients are usually mothers in their twenties. The "proxy" is usually a child, often a pre-verbal infant or toddler. *Id.* MSBP patients often "smother their child; inject him with insulin; feed him poison, ipecac, or laxatives; cause dehydration; overmedicate; induce fevers, diarrhea, vomiting, or seizures; or con-

taminate blood, urine, or feces samples." *Id.* There have been an estimated 200 to 1000 cases diagnosed since doctors first isolated the syndrome. *Id.* at 377.

3. During Morrison's deposition, the following colloquy occurred:

Q: Did you think on that day [the 27th] that if you didn't remove him, he would die within a few days?

A [Morrison]: No.

Q: Did you think that if you didn't remove him, he would die within a week?

A: No.

Q: A month?

A: I have no way to know that.

Q: You are pretty sure it wouldn't be a few days?

A: Pretty sure.

4. Morrison admitted in her deposition that the primary reason for removing Rusty was to change his living quarters and see if his condition improved. This is one way of diagnos-

On May 28, Morrison and Sneddon met with the Assistant Attorney General of Utah, Craig Peterson, who advised them that the facts supported removing Rusty from the home. Morrison and Sneddon, accompanied by a police officer, allegedly entered the Roska residence without a warrant and without knocking and proceeded to remove Rusty. Before leaving, they were admonished over the phone by Doctor Gooch that removal could destroy "this family emotionally and Rusty may never recover." Sneddon consulted with her supervisor, Colleen Lasater, and then proceeded with the removal. Appellees contend that, while in the home, Sneddon pushed Rusty's sisters, Maria Stewart and Jessica Roska, as they attempted to comfort Rusty, and abused others in the home, both physically and verbally.[5] Rusty was placed in a foster home, where he allegedly was not given proper medication for his chronic pain.

At an initial shelter hearing on June 3, 1999, the juvenile court ruled that Rusty should remain in protective custody. After additional evidence was produced the next day, the court ordered that Rusty be returned to the Roskas' care. The court also ordered the Roskas to permit substantial intervention by DCFS in Rusty's treatment.

On October 6, 1999, plaintiffs commenced this action under 42 U.S.C. § 1983. The plaintiffs are Rusty Roska, Connie and James Roska (Rusty's parents), and Maria Stewart and Jessica Roska (Rusty's sisters). The defendants are Craig T. Peterson, Assistant Attorney General for the State of Utah; Melinda Sneddon, a social worker with DCFS; Shirley Morrison, a social worker with DCFS; Colleen Lasater, Sneddon's and Morrison's supervisor; Dan Choate and Darla Rampton, DCFS placement workers who placed Rusty in a foster home. The first, third, fourth, and fifth causes of action are directed against Peterson, Sneddon, and Morrison and allege three Fourth Amendment violations[6] and a Fourteenth Amendment violation.[7] The second cause of action alleges that defendants Sneddon and Morrison used unreasonable force in violation of the Fourth Amendment. The sixth and seventh claims allege that all defendants violated Rusty's Fourteenth Amendment substantive due process right to be safe from harm while held by the state (sixth cause of action) and Mr. and Mrs. Roska's Fourteenth Amendment rights to direct their children's medical care (seventh cause of action). Finally, plaintiffs' eighth cause of action is against defendant Morrison for alleged malicious prosecution and abuse of process. The district court granted defendants summary judgment on grounds of qualified immunity. We now affirm in part, reverse in part, and remand for further proceedings.

---

ing MSBP. This was substantiated at the June 3rd Shelter Hearing as well.

5. Maria Stewart, who is Connie Roska's daughter, testified that Sneddon pushed her against a wall while she attempted to calm Rusty and told her to "get the hell out." Jessica Roska testified that Sneddon told her to "shut the f* *k up" when Jessica asked Sneddon to leave Rusty alone. Stacey Coles, who was picking up her son at the Roskas' house, testified that Sneddon also told her to "shut the f* *k up" and pushed her into a couch, causing her to cut her lip.

6. Plaintiffs allege that their Fourth Amendment rights were violated when defendants unreasonably searched the plaintiffs' home (first cause of action), unreasonably seized Rusty (third cause of action), and abused and kidnapped Rusty (fourth cause of action).

7. Plaintiffs allege that defendants violated their Fifth and Fourteenth Amendment rights to maintain a family relationship (fifth cause of action).

## II. Discussion

### A. Standard of Review

 We review de novo a district court's ruling on qualified immunity. *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir.2002). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* To determine whether a plaintiff can overcome the qualified immunity defense, "first we determine whether the plaintiff has asserted a violation of a constitutional or statutory right, and then we decide whether that right was clearly established such that a reasonable person in the defendant's position would have known that [his] conduct violated that right." *Garramone v. Romo,* 94 F.3d 1446, 1449 (10th Cir. 1996) (citation omitted). Order is important; we must decide first whether the plaintiff has alleged a constitutional violation, and only then do we proceed to determine whether the law was clearly established. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

### B. Violation of a Constitutional Right

#### 1. Fourth Amendment Claims (Counts 1, 2, 3, 4, and 8)

The Fourth Amendment, applied to the states through the Fourteenth Amendment's Due Process Clause, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. Plaintiffs advance five theories upon which a Fourth Amendment violation might be found. We address each in turn.

#### a. The Warrantless No–Knock Entry (Count 1)

 It is well-established that a warrantless search is presumptively unreasonable under the Fourth Amendment unless it falls within a specific exception to the warrant requirement. *United States v. Zubia–Melendez,* 263 F.3d 1155, 1162 (10th Cir.2001). It is similarly well-established that an official must knock before entering a domicile, unless the official has a reasonable suspicion that knocking and announcing his or her presence would be dangerous or futile or would inhibit the effective investigation of the crime. *Richards v. Wisconsin,* 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997).

 Plaintiffs have produced several affidavits indicating that defendants did not knock before entering the Roskas' house. We find no facts in the record indicating that knocking and announcing the presence of the defendants would have been dangerous or futile or would have inhibited the seizure of Rusty. We therefore hold that Plaintiffs have sufficiently asserted a violation of the Fourth Amendment as a result of the "no-knock" entry.

 The only exception to which defendants point in order to justify their failure to obtain a warrant before entering and searching the Roskas' residence is the "exigent circumstances" exception. Exigent circumstances arise when

(1) the law enforcement officers ... have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search [is not] motivated by an intent to arrest and seize evidence, and (3) there [is] *some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.*

*United States v. Anderson,* 981 F.2d 1560, 1567 (10th Cir.1992) (alterations in original). The government bears the burden of proving exigency. *United States v. Wicks,* 995 F.2d 964, 970 (10th Cir.1993). The government's burden is "particularly heavy where the police seek to enter a suspect's home." *Anderson,* 981 F.2d at 1567 (quoting *United States v. Maez,* 872 F.2d 1444, 1452 (10th Cir.1989)). In evaluating whether exigent circumstances existed, we examine the circumstances "as they would have appeared to prudent, cautious, and trained officers." *United States v. Anderson,* 154 F.3d 1225, 1233 (10th Cir. 1998). This exception is narrow, and must be "jealously and carefully drawn." *Id.*

After examining this record, we conclude that the record contains no evidence that could lead a reasonable state actor to conclude that there were exigent circumstances. Although defendants at times assert that a delay to obtain a warrant might have cost Rusty his life, the evidence shows otherwise. Defendants were aware that various doctors had suspected that Rusty was a victim of MSBP for quite some time, and the record indicates that there was nothing particularly unusual about Rusty's condition at the time he was removed. Rusty's attending physician stated on the phone that it would be a mistake to remove him from the home.[8] Because no evidence indicates that Rusty was in immediate threat of death or severe physical harm—indeed, the evidence points to the opposite conclusion—we do not find sufficient exigent circumstances to relieve the state actors here of the burden of obtaining a warrant. *See Coolidge v. New Hampshire,* 403 U.S. 443, 470–71, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ("But

where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it ... [t]he requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se unreasonable' in the absence of 'exigent circumstances.' ").

### b. Unreasonable Use of Force (Count 2)

■■■■ Plaintiffs claim that Sneddon and Morrison violated Jessica Roska's and Maria Stewart's Fourth Amendment rights to be free of unreasonable use of force by pushing them against a wall. Before addressing an unreasonable use of force claim, we must examine the context in which the claim arises. *Austin v. Hamilton,* 945 F.2d 1155, 1158 (10th Cir.1991) ("We must first place the objectionable events in this case somewhere along the custodial continuum running through initial arrest or seizure, post-arrest but pre-charge or pre-hearing custody, pretrial detention, and post-conviction incarceration; and then determine what constitutional protection controls at which particular juncture."), *overruled on other grounds, Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *see also Metcalf v. Long,* 615 F.Supp. 1108, 1118–20 (D.Del.1985) (noting that post-conviction claims for excessive force are brought under the Eighth Amendment). Claims that state actors used excessive force—deadly or not—in the course of a seizure are analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104

---

**8.** Defendants are correct that the subjective motivations of the state actors are largely irrelevant. Thus, Morrison's deposition testimony that she did not believe that Rusty was in imminent threat of death is irrelevant to this question. This is, however, a double-edged sword, as any contradictory testimony from the social workers that they believed Rusty to be in grave peril is also irrelevant to this question.

L.Ed.2d 443 (1989). Plaintiffs must show both that a "seizure" occurred and that the seizure was "unreasonable." *Brower v. County of Inyo*, 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). A person is seized within the meaning of the Fourth Amendment when "a reasonable person would believe that he or she is not 'free to leave.'" *Florida v. Bostick*, 501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Here, nothing indicates that Jessica Roska or Maria Stewart did not feel free to leave. Quite the contrary, Sneddon's alleged statement to "get the f***k out" indicates that they were encouraged to leave. Hence, we cannot say they were seized within the meaning of the Fourth Amendment.

A determination that plaintiffs were not seized within the meaning of the Fourth Amendment does not end the inquiry, however. Substantive due process analysis is appropriate in cases that involve excessive force where a specific constitutional provision—such as the Fourth or Eighth Amendment—does not apply. *County of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (" '*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is 'covered by' the Fourth Amendment.") (quoting *United States v. Lanier*, 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). We therefore analyze plaintiffs' claim un-

der the Fourteenth Amendment Due Process Clause.

The Fourteenth Amendment protects citizens against state actions that deprive them of life, liberty, or property without due process of law. U.S. Const. amend. XIV. We examine three factors in determining whether force was excessive within the meaning of the Fourteenth Amendment: (1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor. *Hannula v. City of Lakewood*, 907 F.2d 129, 131–32 (10th Cir.1990). Force inspired by malice or by "unwise, excessive zeal amounting to an abuse of official power that shocks the conscience ... may be redressed under [the Fourteenth Amendment]." *Hewitt v. City of Truth or Consequences*, 758 F.2d 1375, 1379 (10th Cir. 1985). While we express some doubt as to the need to push or swear at adolescent girls, use of such force to move children who might be interfering with the removal of a child from the home is not so disproportionate as to rise to the level of a liberty violation within the meaning of the Due Process Clause. Additionally, no serious physical injury was inflicted, and "we have never upheld an excessive force claim without some evidence of physical injury" outside of the context of a Fourth Amendment violation. *Bella*, 24 F.3d at 1257. Finally, nothing in the record indicates that the defendants were motivated by malice or other improper motive.[9] In sum, the facts alleged here fall short of the type of force that has been found to rise to the level of a due process violation. *Compare Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir.1989) (upholding a due process claim where four plain clothes po-

---

9. We acknowledge that plaintiffs have alleged malicious prosecution and claim that defendants' seizure of Rusty had improper motivations. Nothing, however, indicates that the relevant plaintiffs were pushed by Sneddon as the result of a malicious motive.

lice officers were conducting "preventive rounds" in search of drug traffickers and, with guns drawn, approached a young couple sitting in a car and, when the driver hastily started the engine and drove away, began shooting without warning and struck the driver in the back with one bullet, damaging his spinal cord and rendering him a paraplegic), *with Bella*, 24 F.3d 1251 (finding no due process violation where police officers allegedly shot at and struck plaintiff's helicopter while plaintiff unwillingly assisted in the escape of three inmates). The district court was correct in dismissing this count.

### c. The Seizure of Rusty (Count 3)

■ Rusty, however, clearly was not free to leave, and therefore he was seized within the meaning of the Fourth Amendment. Defendants seized him without a warrant and without exigent circumstances. Plaintiffs have therefore sufficiently alleged a violation of Rusty's Fourth Amendment right to be free from unreasonable seizures.

### d. "Fourth Amendment Right" to be Protected Against Child Abuse and Kidnapping (Count 4)

■ Plaintiffs assert that defendants violated Rusty's Fourth Amendment right to be protected against child abuse and kidnapping. We find no authority that suggests the existence of such a constitutional right, and we analyze this claim along with plaintiffs' more traditional due process and unreasonable seizure claims.

To the extent that plaintiffs sought to assert a distinct Fourth Amendment violation for child abuse and kidnapping, the district court properly dismissed Count 4.

### e. Malicious Prosecution and Abuse of Process (Count 8)

■ Plaintiffs claim that defendant Morrison is liable for malicious prosecution and abuse of process. In this circuit, state law provides the starting point for a constitutional claim of malicious prosecution and abuse of process. *Erikson v. Pawnee County Bd. of County Comm'rs*, 263 F.3d 1151, 1154, 1155 n. 5 (10th Cir.2001). In Utah, malicious prosecution occurs when "(1) defendants initiated or procured the initiation of criminal proceedings against an innocent plaintiff; (2) defendants did not have probable cause to initiate the prosecution; (3) defendants initiated the proceedings primarily for a purpose other than that of bringing an offender to justice; and (4) the proceedings terminated in favor of the accused." *Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 156 (Utah 1991). Here, Morrison did not initiate or procure the initiation of criminal proceedings. Therefore, there is no Fourth Amendment claim for malicious prosecution.[10]

■ Under Utah law, abuse of process claims require that legal proceedings be instituted "without probable cause, for the purpose of harassment or annoyance; and it is usually said to require malice." *Baird v. Intermountain Sch. Fed. Credit Union*, 555 P.2d 877, 878 (Utah 1976). Utah law has also defined the tort as using

---

**10.** Utah allows for a similar tort for civil proceedings, called wrongful use of civil proceedings. *Gilbert v. Ince*, 981 P.2d 841, 845 (Utah 1999). Although no Utah case is on point, most jurisdictions include quasi-criminal proceedings in the latter tort. W. Page Keeton, et al., *Prosser & Keeton on Torts* 890 (5th ed.1984). However, plaintiffs have not pled wrongful use of civil proceedings, and

they do not argue it in their briefs. Neither an opposing party nor this court is under any obligation to craft legal theories for a plaintiff. *See Abdelsamed v. United States*, 31 Fed.Appx. 632, 633 (10th Cir.2002); *see also* Fed. R. Civ. Pro. 8(a) (requiring a short and plain statement of the grounds for relief). We therefore do not address a potential claim for wrongful use of civil proceedings.

judicial resources "to accomplish some improper purpose, such as compelling its victim to do something which he would not otherwise be legally obliged to do." *Crease v. Pleasant Grove City,* 30 Utah 2d 451, 519 P.2d 888, 890 (1974). If the criminal process is used for its intended purpose, "the mere fact that it has some other collateral effect" does not render the action an abuse of process. *Id.* Even actions motivated purely by spite will not support a claim if process is ultimately used only to accomplish the result for which it was created. *Prosser & Keeton* at 897.

■ Morrison stated in her deposition that she did not believe Rusty's death was imminent and that she commenced the removal in part to create a type of controlled experiment to facilitate a diagnosis of MSBP. However, no inference of an improper, ulterior purpose can be drawn from these statements. Rather, these statements are wholly consistent with an attempt to diagnose MSBP, even if Rusty's imminent death was not expected. Because there is no evidence from which an inference can be drawn that Morrison used the judicial process to accomplish some improper purpose, we find that plaintiffs have not sufficiently alleged an abuse of process violation.

### 2. Fourteenth Amendment Claims

The Fourteenth Amendment Due Process Clause provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend XIV, § 1. Plaintiffs advance three theories to assert a deprivation of their liberty interests without due process of law.

#### a. Right to Maintain a Family Relationship (Count 5)

Plaintiffs contend that they were deprived of their liberty interest in their family relationship without due process of law when Rusty was removed without notice or a hearing. Based on the pleadings and depositions, plaintiffs have sufficiently alleged a deprivation of a constitutional right here.

■ In *Santosky v. Kramer,* the Supreme Court made clear that termination of parental rights impinges upon a liberty interest that may not be deprived without due process of law. 455 U.S. 745, 753–54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). *Santosky* dealt only with the proper standard of review and arose within the context of a permanent termination of parental rights. This circuit has applied *Santosky*'s holding, however, to the temporary seizures of children and has held that notice and a hearing are required before a child is removed " 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' " *Spielman v. Hildebrand,* 873 F.2d 1377, 1385 (10th Cir.1989) (quoting *Smith v. Org. of Foster Families for Equal. & Reform,* 431 U.S. 816, 848, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977)). "Valid governmental interests" include "emergency circumstances which pose an immediate threat to the safety of a child." *Hollingsworth v. Hill,* 110 F.3d 733, 739 (10th Cir.1997). As the Second Circuit has noted, the "mere possibility" of danger is not enough to justify a removal without appropriate process. *Tenenbaum v. Williams,* 193 F.3d 581, 594 (2d Cir.1999)

■ As we have discussed above, plaintiffs have pled sufficient facts to demonstrate that emergency circumstances did not exist to justify Rusty's immediate removal from the home. Defendants did not even attempt to obtain an *ex parte* order. We therefore find that plaintiffs have sufficiently alleged a violation of their Four-

teenth Amendment procedural due process rights.

### b. Right to be Safe From Harm While Being Held by the State (Count 6)

Plaintiffs claim that Rusty was deprived of his liberty interest in being safe from harm when the state placed him in a foster home that was unprepared to meet his needs and when he was given the wrong dose of methadone in the foster home.

States must ensure "reasonable care and safety" to persons within their custody. *Youngberg v. Romeo,* 457 U.S. 307, 324, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). This includes children in foster care. *Yvonne L. v. N.M. Dep't of Human Servs.,* 959 F.2d 883, 892 (10th Cir.1992). There are two circumstances in which the state may be liable for failing to ensure the safety of children in its care. First, the state may be liable when a state actor shows "deliberate indifference to serious medical needs" of a child who is in state custody. *Garcia v. Salt Lake County,* 768 F.2d 303, 307 (10th Cir.1985). Second, a state may be liable when state actors "place children in a foster home or institution that they know or suspect to be dangerous to the children," if harm actually occurs. *Id.* at 893.

There are no allegations here that state actors showed deliberate indifference to Rusty's health problems.[11] Plaintiffs allege only that defendants knew that the foster home in which Rusty was placed was not equipped to care for him. In support of this assertion, plaintiffs offer deposition testimony that the foster mother could not care for Rusty, that defendants had had a similar problem with children once before, and that Morrison was aware that Rusty was suffering and did nothing. However, a more thorough examination of the record reveals that the foster parents simply indicated that they would not be able to care for Rusty on a long-term basis, and that a child in a similar situation had been placed in a nursing home. The bare assertion that Morrison was aware of Rusty's suffering and did nothing is insufficient to defeat qualified immunity.[12] The district court was correct in dismissing the claim.

### c. Right to Direct Children's Medical Care (Count 7)

Plaintiffs allege that the removal of Rusty and his placement in state care violated Connie and James Roska's rights to direct their son's medical care. In support of this contention, plaintiffs direct us to one case: *In re J.P.,* 648 P.2d 1364 (Utah 1982). That case addressed a permanent

---

**11.** Plaintiffs do not name the foster parents as defendants, nor do they allege that any named defendant was involved in determining the methadone levels that Rusty received. Plaintiffs' allegations that defendants ignored Dr. Gooch's recommendation that Rusty remain with his family as part of his rehabilitation do not rise to the level of deliberate indifference.

**12.** Plaintiffs alleged in their initial pleadings that Morrison was aware that Rusty was suffering in foster care. This could potentially qualify as "deliberate indifference." However, plaintiffs do not mention this in their briefs on appeal, and they direct us to no citation in the record in support of this contention. Without a specific reference, "we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1546 (10th Cir.1995) (citing *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")). Although this allegation might have been asserted on appeal, and it might constitute a sufficient allegation of a denial of a constitutional right, it is unsupported by the evidence and is therefore ultimately insufficient to defeat defendants' motion for summary judgment.

termination of parental rights. *Id.* at 1366 n. 1. Plaintiffs point us to no authority or argument supporting an extension of such a right to a temporary deprivation such as that suffered by the Roskas. We also note that the Utah case cited by plaintiffs does *not* refer to a Fourteenth Amendment right of parents to direct their child's medical care. Rather, it simply notes that Utah law includes such a right among those that a state may terminate upon an adequate showing of parental abuse or neglect.

Plaintiffs' briefing gives us no substantive argument as to what the scope of such a right might be or how other interests should be balanced against such a right. Perhaps most important, nothing in the record indicates that the state sought to alter Rusty's medical program, other than an alleged inadvertent change in his methadone dosage. Given the paucity of the plaintiffs' arguments and evidence on this point, we cannot find that plaintiffs have made an adequate showing of a deprivation of a constitutional right to direct Rusty's medical care.[13]

**D. Were the Rights Clearly Established?**

Having decided that the plaintiffs have adequately alleged that they suffered constitutional violations when the social workers entered their house without knocking and without a warrant (Count 1), when they seized Rusty without a warrant (Count 3), and when they removed him without seeking an order from a judge (Count 5), we now consider whether the

law was clearly established at the time the violations occurred. The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains. *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir. 2002). The contours of the right must be sufficiently clear that an objectively reasonable officer would understand that what she is doing violates that right. *Anderson v. Creighton,* 483 U.S. 635, 639–640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). As our discussion above indicates, it was clearly established in May 1999 that the Constitution prohibits warrantless, no-knock entries, warrantless seizures, and removal of a child from the home without following proper procedures. Defendants advance two theories why the rights described above were nonetheless not clearly established at the time Rusty was removed. We address each in turn.

*1. The Statute*

Defendants' first theory is that section 78–3a–301 of the Utah Code rendered the law on exigent circumstances unclear. We disagree.

Section 78–3a–301 is titled "Removing a child from his home—grounds for removal—Exigent circumstances." It provides, in pertinent part: "The Division of Child and Family Services may not remove a child from the custody of his natural parent unless ... there is a substantial danger to the physical health or safety of the

---

**13.** To clarify, we do not completely deny that such a right might exist, possibly within the context of general familial rights. *Cf. Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("[A] natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right.") (internal

quotation marks omitted); *Meyer v. Nebraska,* 262 U.S. 390, 400–03, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (holding that the Due Process Clause confers a right to direct a child's education). We simply state that plaintiffs have made neither an adequate argument nor a factual showing to support such a right on this record.

minor and the minor's health or safety may not be protected without removing him from his parent's custody." Utah Code Ann. § 78–3a–301(1),(1)(a). It is undisputed that the social workers relied upon this statute to justify their removal of Rusty.

■ It is clear that reliance upon a statute may excuse a state actor's actions even if the statute itself is eventually found unconstitutional. *Michigan v. DeFillippo,* 443 U.S. 31, 37–38, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Because the defendants relied upon section 78–3a–301 to justify their removal of Rusty, and because that statute has not been held unconstitutional, the district court found that defendants were entitled to qualified immunity.

A closer examination of the statutory scheme, however, leads us to a different conclusion. An objectively reasonable officer, reading this statute, would not believe that it excused her from the warrant requirement or from seeking a pre-deprivation hearing. The statute simply states that the policy of the state of Utah is that families should remain intact and then offers exceptions to that policy. Nothing in the statute mentions warrants, hearings, knocking, or the Fourth or Fourteenth Amendments. Indeed, the statute does not even offer immediacy of injury as a prerequisite for removal. Given this, a reasonable state actor would not conclude that the statute offered an exception to the warrant requirement or to the Due Process Clause's requirement of notice and a hearing.

It is true that the title of the section refers to "exigent circumstances." "Exigency," however, is both an everyday term in the English language and a term of art within the meaning of the Fourth Amendment. The statute makes no reference to the Fourth Amendment or to its warrant or probable cause requirements. A reasonable state actor examining the statute's text would conclude that the statute was not using "exigent circumstances" as a term of art within the meaning of the Fourth Amendment. Given this, section 78–3a–301(1) does not render the state of the law unclear.[14] *Cf. Calabretta v. Floyd,* 189 F.3d 808, 817 (9th Cir.1999) (denying qualified immunity, while noting that the regulations upon which defendants relied to justify their warrantless search neither referred to the warrant requirement nor suggested that warrants were not needed to enter a home).

### 2. Special Needs Searches

Defendants also argue that the law was unclear as to whether social workers performing their duties are covered by the Fourth Amendment's warrant requirement. We hold that they are and that the law was clearly established at the time of Rusty's removal.

■ Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment—subject only to a few "specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576, (1967) (footnotes omitted). This insistence upon interposing a "neutral and detached magistrate" between the state and the citizenry, subject to a few exceptions justified only by "exceptional circumstances," *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), has become a "cardinal principle" of Fourth Amendment jurisprudence. *Mincey v. Arizona,*

---

**14.** Because section 78–3a–301 does not justify a warrantless search, we need not consider the constitutionality of the statute or whether the defendants were operating within the scope of the statute.

437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

Within the last thirty years, courts have increasingly recognized certain narrow circumstances that justify searches and seizures without reference to the warrant clause or probable cause. These are situations where the requirement of a warrant based upon probable cause is ill-suited to achieving certain "special needs" of government, such as enforcing school discipline, *New Jersey v. T.L.O.*, 469 U.S. 325, 333–40, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), allowing administrative searches of the business premises of "closely-regulated industries," *New York v. Burger*, 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), and taking inventory of seized items for "caretaking" purposes, *Cady v. Dombrowski*, 413 U.S. 433, 447–48, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

■ In all "special needs" cases, the nature of the need addressed makes particularized suspicion impossible or otherwise renders the warrant requirement impractical. For example, in *Griffin v. Wisconsin*, 483 U.S. 868, 876, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the Court noted that requiring a warrant before a search of a probationer's home would "interfere to an appreciable degree with the probation system," and would "reduce the deterrent effect that the possibility of expeditious searches would otherwise create." Similarly, the *Burger* Court noted that "surprise is crucial if the regulatory scheme aimed at remedying this major social problem is to function at all." 482 U.S. at 710, 107 S.Ct. 2636; *see also Skinner*, 489 U.S. at 619, 109 S.Ct. 1402 (recognizing that the special need articulated must "make the warrant and probable-cause requirement impracticable" before waiving those requirements).[15] If a special need renders the warrant requirement impracticable, we then balance the nature of the privacy interest upon which the search intrudes and the degree of intrusion occasioned by the search against "the nature and immediacy of the governmental concern at issue ... and the efficacy of this means for meeting it." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654, 658, 660, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

We find no special need that renders the warrant requirement impracticable when social workers enter a home to remove a child, absent exigent circumstances. First, we note that individualized suspicion is at the heart of a removal of a child from a home, distinguishing the instant case from the various drug testing cases that have been addressed by the Court. Second, unlike the situation in *Burger* (and assuming that exigent circumstances are not present), there is no need for surprise or sudden action that renders obtaining a warrant counterproductive. Nor is this situation similar to the position of the probationer in *Griffin*—the Roskas were not

---

**15.** Although they were decided after Rusty was seized and hence do not directly guide our decision on whether the law on special needs searches was clearly established in May of 1999, the two most recent Supreme Court cases to address "special needs" searches, *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), and *Board of Education v. Earls*, —— U.S. ——, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) do nothing to alter our conclusion. *Earls*, —— U.S. at ——, 122 S.Ct. at 2564 ("[A] search unsupported by probable cause may be reasonable when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.") (internal quotation marks omitted); *Ferguson*, 532 U.S. at 83, 121 S.Ct. 1281 (declining to hold that a "special need" to get individuals into substance abuse treatment justified warrantless searches, because "the immediate objective of the searches was to generate evidence *for law enforcement purposes* ").

in the criminal justice system, there was no deterrent function being served by the threat of a sudden, warrantless search, and there was no immediate need for a quick response.[16] Simply put, unless the child is in imminent danger, there is no reason that it is impracticable to obtain a warrant before social workers remove a child from the home. Defendants took the time to seek the advice of Utah's Assistant Attorney General before proceeding with the removal; surely they could have taken the time to incur the minimal inconvenience involved in obtaining a warrant. *Burger*, 482 U.S. at 727, 107 S.Ct. 2636 (Brennan, J., dissenting).

It is true that the state has a strong interest in protecting children, and that this interest should be taken into account in evaluating the reasonableness of the search and seizure challenged by plaintiffs. However, what is reasonable under the Fourth Amendment "depends on the context within which a search takes place." *T.L.O.*, 469 U.S. at 337, 105 S.Ct. 733. The action challenged in this case involved not only a warrantless search, but also the removal of a child from his parents. In such a case, the interest of the government in protecting the child must be balanced against the interest of the parents in keeping the family together. "Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Measured against this parental interest, the state's interest in protecting children

does not excuse social workers from the warrant requirement of the Fourth Amendment.

Defendants are quite correct that there is no case directly on point, either in the Supreme Court or in this circuit. As we noted above, however, this is unnecessary. *Hope v. Pelzer*, —— U.S. ——, ——, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.... [T]he salient question ... is whether the state of the law ... gave [defendants] fair warning that their alleged [actions were] unconstitutional."). A requirement of a case that is directly on point would quickly transform the qualified immunity standard into an absolute immunity standard in the vast majority of cases. *Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 892 (10th Cir.1992). Instead, we recognize that if the authority from other courts is heavily weighted toward plaintiff's interpretation, or if it is clear that doctrine points toward plaintiff's interpretation, we will still hold that the law was clearly established. *Id.*

■ Under either of these standards, we have little difficulty finding that the law was clearly established at the time Rusty was removed from his home. Our jurisprudence has long recognized that a person's privacy interest is at its highest in a person's home. *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has

---

**16.** This statement is not meant to foreclose the possibility that a special need justifying an abrupt, warrantless search of a home might not be present when a family is already in the DCFS system or when a child has been placed in a foster home. These are situations where routine, random inspections *might* be needed in order to assure the safety of the child's conditions. But that is simply not the situation here, where the social workers entered the Roskas' house not to inspect Rusty, but to remove him. Indeed, the record reveals that even though the social workers found that Rusty looked much healthier than they expected, they nonetheless proceeded with the removal.

drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *United States v. U.S. District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("[P]hysical entry into the home is the chief evil against which the ... Fourth Amendment is directed...."). Indeed, the only situation in which the Supreme Court has approved a special needs search of an individual's home occurred in *Griffin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709, where the defendant was a probationer. *Cf. Camara v. Municipal Court*, 387 U.S. 523, 540, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (holding that a warrant was needed to perform an administrative search upon private property). That situation is not applicable here. Moreover, the special needs doctrine has always explicitly required that the nature of the need asserted must somehow render the warrant requirement impracticable, which is not the case when a state actor removes a child from a home without exigent circumstances.

Additionally, the guidance from our circuit and other courts clearly establishes that such searches are unreasonable. In *Franz v. Lytle*, 997 F.2d 784, 791–92 (10th Cir.1993), our circuit held that police officers could not enter a house without a warrant to investigate potential child abuse. The *Lytle* Court also held that the police officer was not entitled to qualified immunity, notwithstanding arguments nearly identical to those made by the defendants here. Moreover, every other case of which we are aware involving the entry of social workers or police officers into a home to inspect or remove a child has held that such searches require warrants. *Good v. Dauphin County Soc. Servs.*, 891 F.2d 1087, 1093–94 (3d Cir. 1989); *State in Interest of A.R.*, 937 P.2d 1037, 1040 (Utah 1997); *New Jersey Div. of Youth & Family Servs. v. B.W.*, 165 N.J.Super. 492, 398 A.2d 611, 613 (N.J.Juv. & Dom.Rel.Ct.1978) ("It is also clear that the Fourth Amendment of the United States Constitution ... protect[s parents] from invasion of their right to privacy within their home."). *See also Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir.1999) (decided after May 1999).

The only case to which defendants point, *Darryl H. v. Coler*, 801 F.2d 893 (7th Cir.1986), is inapposite.[17] There, caseworkers conducted strip searches of children in a school setting. *Id.* at 896–97. The Seventh Circuit found that these searches involved "special needs" that rendered the warrant requirement impracticable. *Id.* at 901–02. The case before us and the other cases cited above, however, do not turn on the question of whether the *inspection* of a child requires a warrant, but rather on the question of whether social workers who are intent on removing a child are exempted from the warrant requirement when entering a home. Nothing in *Darryl H.* suggests that they are. To the contrary, it is clear that entry into the home by social workers to remove a child requires a warrant. As the Utah Supreme Court put it, "[t]here is *no basis* for holding that the Fourth Amendment's protections are inapplicable to searches conducted by state actors in civil child protection proceedings which have the potential to

---

17. *Darryl H.* is also the case to which we have pointed for the proposition that the circuits are split on the scope of a social worker's powers to act without a warrant. *E.g., Snell v. Tunnell*, 920 F.2d 673, 697 (10th Cir.1990). As we note below, however, the circuits are split over the power of a social worker to *inspect* a child without a warrant, not over the power to *enter a home* without a warrant—thus implicating the strong constitutional right against unreasonable intrusions into the home—and *remove a child* without a warrant—thus implicating the parental right to keep the family together.

substantially affect the interests of parents." *Interest of A.R.*, 937 P.2d at 1040 (emphasis added).

We implied in *Lytle* that social workers may be subject to a lesser Fourth Amendment standard than police officers. That suggestion, however, is insufficient to make the law unclear when applied to the circumstances of this case. The Constitution affords strong protection against unreasonable searches and seizures in the home. Case law makes clear that the special needs exception has narrow applicability to situations in which the warrant requirement is impracticable. Moreover, the removal of a child from his parents' custody implicates the parents' right to keep the family together. Given these factors, we conclude that it was clearly established in May 1999 that the warrantless, no-knock entry into the Roska home, the warrantless seizure of Rusty, and the removal of Rusty without pre-deprivation procedures violated the Constitution.

### E. Extraordinary Circumstances

As an alternative, defendants argue that extraordinary circumstances were present and justified their actions. The district court agreed and found that the defendants' reliance upon the advice of counsel was sufficient to grant them qualified immunity. We disagree.

 The general rule is that a qualified immunity defense fails once a plaintiff has alleged that defendants have violated the plaintiff's clearly established rights. Occasionally, however, objectively "extraordinary circumstances" are present which combine to justify a grant of immunity nonetheless. *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors."). Extraordinary circumstances are those rare circumstances where the "defendant was so 'prevented' from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right." *Cannon v. City & County of Denver*, 998 F.2d 867, 874 (10th Cir.1993). In *V–1 Oil Co. v. Wyoming Department of Environmental Quality*, we held that "reliance on the advice of counsel in certain circumstances rises to the level of extraordinary circumstances" that would justify a grant of qualified immunity. 902 F.2d 1482, 1488 (10th Cir.1990). When determining whether receiving legal advice amounts to an extraordinary circumstance that justifies a grant of qualified immunity, we consider the following factors: (1) how unequivocal and specific the advice was; (2) how complete the information provided to the attorney giving the advice was; (3) the prominence and competence of the attorneys; and (4) the time between the dispersal of the advice and the action taken. *Id.* at 1489. The burden of proving "extraordinary circumstances" rests upon the defendant asserting the defense. *Cannon*, 998 F.2d at 874.

 Defendants have not met their burden of proving that extraordinary circumstances existed. It is plain from the record that they did consult the Assistant Attorney General—who is certainly a prominent attorney—and that he did approve the removal. All the record shows, however, is that Peterson advised the defendants that removal was probably justified under section 78–3a–301. The record does not show that Peterson advised the defendants that section 78–3a–301 meant that they did not need to knock, that they did not need a warrant, or that they did

not need to seek pre-deprivation procedures. Because the burden is on defendants to provide such evidence, and because the "extraordinary circumstances" exception is a narrow one, we cannot find that this record supports a finding that defendants relied on legal advice when they did not knock, did not seek a warrant, and did not arrange adequate pre-deprivation procedures. We therefore reverse the district court's findings that extraordinary circumstances existed that justified a violation of clearly established law.

### III. Conclusion

We hold that plaintiffs have adequately alleged that defendants violated plaintiffs' clearly established rights when, in the absence of exigent circumstances, they entered the Roskas' house without knocking and without a warrant (Count 1), when they seized Rusty without a warrant (Count 3), and when they removed Rusty from his parents' custody and care without notice and a hearing (Count 5). We hold that the district court was correct in dismissing the remainder of the plaintiffs' claims. On remand the district court should first determine which defendants are still properly joined in the matter before proceeding further.[18] We conclude by noting, as we did in *Franz v. Lytle*, 997 F.2d 784, 793 (10th Cir.1992), that "[w]e must further underscore the defendant's motive to protect the child ... does not vitiate plaintiffs' Fourth Amendment rights. That motive, however, may enter the calculus of the damages, if any, that his actions justify. We must leave that determination for a jury."

This case is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

---

18. For instance, it is unclear whether defendant Peterson did anything to encourage a *warrantless* removal; he might have said simply that removal was justified under the statute. It is similarly unclear what claim remains against defendants Choate and Rampton.